UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| RICHARD CORDES | CIVIL ACTION |
| VERSUS | NO. 21-432 |
| NEW ORLEANS PUBLIC BELT RAILROAD CORP. | SECTION "R" (3) |

# ORDER AND REASONS

Before the Court is defendant New Orleans Public Belt Railroad Commission for the Port of New Orleans's ("NOPB") motion for partial summary judgment.[1] Plaintiff, Richard Cordes, opposes the motion.[2] Because material facts remain in dispute, the Court denies the motion.

## I. BACKGROUND

This case arises out of a railroad worker's injuries allegedly sustained while working as a carman for the NOPB. Plaintiff Richard Cordes worked as an NOPB carman for twenty-two years.[3] On June 13, 2018, plaintiff was working a shift from 10:00 p.m. to 6:00 a.m.[4] Around 2:00 a.m., Cordes was

1 R. Doc. 10.
2 R. Doc. 14.
3 R. Doc. 10-3 at 2 (Deposition of Richard Cordes, 11:19-25).
4 *Id.* at 4 (Deposition of Richard Cordes, 19:8).

called to inspect an outbound train on the NOPB's main line between Jackson and Napoleon Avenue in New Orleans.[5] As the train initially passed Cordes, and the crew pulled the train onto the main line, Cordes noticed that one of the cars had its hand brake[6] set.[7] After the train came to a stop, Cordes put up his "blue flag protection," a safety measure used to prevent others from approaching a stopped train, and began inspecting the train.[8] The train's engine continued to run, and the crew remained onboard while plaintiff performed his inspection.[9]

During Cordes's inspection, he attempted to release the hand brake on the car that he had previously noticed had its brake engaged.[10] To do so, plaintiff stepped onto the running board at the back of the car, and initially attempted to release the hand brake by pulling down on the "release rod" lever, which plaintiff testified is "supposed to release the brakes."[11] But the

---

5 *Id.* at 5-7 (Deposition of Richard Cordes, 19:21; 20:13-21:18).

6 A train's "hand brake" is analogous to a parking brake on a car. R. Doc. 14-2 at 10 (Deposition of Richard Cordes, 72:17-24); *see also Andrews v. NFSF Railway Co.*, 284 F. Supp. 3d 910, 913 (S.D. Iowa 2018) ("Hand brakes are similar in nature to parking brakes on automobiles.").

7 R. Doc. 10-3 at 8 (Deposition of Richard Cordes, 23:11-22).

8 *Id.* at 6-7 (Deposition of Richard Cordes, 21:10-22:7).

9 *Id.* at 7 (Deposition of Richard Cordes, 22:8-19).

10 *Id.* at 8 (Deposition of Richard Cordes, 23:4-22).

11 R. Doc. 14-2 at 10 (Deposition of Richard Cordes, 72:12-16).

release rod lever did not work, and the brake on the car remained engaged.[12] To disengage the hand brake, Cordes had to release it manually by turning the wheel on the back of the car.[13] Cordes testified that, as he was turning the wheel, he suddenly felt a "snap," and experienced pain in his lower back.[14] Nevertheless, Cordes successfully disengaged the brake manually, and completed the rest of his inspection.[15] Cordes testified that he did not report the condition of the hand brake to his supervisor because it was "normal" for the release rod not to disengage the hand brake; it was something he dealt with "all the time."[16] Plaintiff alleges that, as a result of the incident, he continued to experience pain in his back, and he "could barely walk."[17] Cordes testified that, on the day after the accident, he went to Urgent Care, where he "got a shot in [his] back," and was told that he "had a sciatic nerve."[18]

Plaintiff also alleges that over two years later, on July 31, 2020, a second incident occurred that caused further injury to his back.[19] On that

---

12 *Id.*
13 *Id.* at 12 (Deposition of Richard Cordes, 27:12-15).
14 *Id.* at 8, 14 (Deposition of Richard Cordes, 23:11-18, 29:16-22).
15 *Id.* at 13 (Deposition of Richard Cordes, 28:17-21).
16 *Id.* at 13-14 (Deposition of Richard Cordes, 28:22-29:11).
17 *Id.* at 17 (Deposition of Richard Cordes, 32:7-14).
18 *Id.*
19 *Id.* at 19-20 (Deposition of Richard Cordes, 42:6-43:2).

day, Cordes received a call from the switching crew, asking for his assistance in fixing a "knuckle" that had fallen out of a car, and was preventing the switching crew from "coupl[ing] that car to another car" during a switching operation.[20] Upon plaintiff's arrival at the NOPB's Cotton Warehouse Yard, he found the knuckle on the ground, which he assumed was because the knuckle pin was either broken or missing.[21] Cordes explained that a knuckle pin holds the knuckle in place to the coupler, and that if the pin breaks, the knuckle "will just fall out."[22] He further stated that it was common for knuckle pins to break or go missing, and that replacing broken knuckle pins and picking up fallen knuckles was a routine part of his job.[23]

Plaintiff testified that, to fix the problem, he first picked up the knuckle and put it back in place on the car, and then secured it to the coupler with a new knuckle pin.[24] Plaintiff asserts that, when he lifted the knuckle off the ground, his "sciatic nerve hit [him]."[25] Plaintiff testified that he did not report to defendant that he had to pick up the vehicle's knuckle because it

---

20 *Id.* at 19-22 (Deposition of Richard Cordes, 42:6-25, 43:23-45:1).
21 *Id.* at 23 (Deposition of Richard Cordes, 46:2-25).
22 *Id.* at 21 (Deposition of Richard Cordes, 44:1-20).
23 *Id.* at 24 (Deposition of Richard Cordes, 47:9-17).
24 *Id.* at 26 (Deposition of Richard Cordes, 49:8-14).
25 *Id.*

was "not a reportable defect," and that it was his "duty as a carman to . . . fix it and[] move on."[26]

On March 1, 2021, plaintiff filed suit against the NOPB, alleging that he injured his back in these two separate instances as a result of the NOPB's failure to provide him with a reasonably safe place to work, in violation of the Federal Employer's Liability Act ("FELA"), 45 U.S.C. § 51, *et seq.*[27] Both of plaintiff's claims are based on violations of the Federal Safety Appliance Act ("FSAA"), 49 U.S.C. § 20302, and its provisions requiring that (1) railroad cars be equipped with efficient hand brakes, and that (2) the cars couple automatically upon impact.[28] On January 11, 2022, defendant moved for partial summary judgment on plaintiff's FSAA claims.[29] Defendant contends that the FSAA does not apply because plaintiff cannot show that the equipment was "inefficient" or "defective," and because the train cars at issue were not "in use" at the time of the two incidents.[30] Plaintiff opposes the motion, contending issues of material fact preclude summary judgment.[31]

The Court considers the parties' arguments below.

---

26 *Id.* at 27 (Deposition of Richard Cordes, 50:3-7).
27 R. Doc. 1 ¶¶ 8, 13.
28 *Id.*
29 R. Doc. 10.
30 R. Doc. 10-1 at 7.
31 R. Doc. 14 at 2.

## II. LEGAL STANDARD

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) (per curiam). "When assessing whether a dispute to any material fact exists, [the Court] consider[s] all of the evidence in the record but refrain[s] from making credibility determinations or weighing the evidence." *Delta & Pine Land Co. v. Nationwide Agribusiness Ins.*, 530 F.3d 395, 398-99 (5th Cir. 2008). All reasonable inferences are drawn in favor of the nonmoving party, but "unsupported allegations or affidavits setting forth 'ultimate or conclusory facts and conclusions of law' are insufficient to either support or defeat a motion for summary judgment." *Galindo v. Precision Am. Corp.*, 754 F.2d 1212, 1216 (5th Cir. 1985) (quoting 10A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2738 (2d ed. 1983)); *see also Little*, 37 F.3d at 1075. "No genuine dispute of fact exists if the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." *EEOC v. Simbaki, Ltd.*, 767 F.3d 475, 481 (5th Cir. 2014).

If the dispositive issue is one on which the moving party will bear the burden of proof at trial, the moving party "must come forward with evidence which would 'entitle it to a directed verdict if the evidence went uncontroverted at trial.'" *Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1264-65 (5th Cir. 1991) (quoting *Golden Rule Ins. v. Lease*, 755 F. Supp. 948, 951 (D. Colo. 1991)). "[T]he nonmoving party can defeat the motion" by either countering with evidence sufficient to demonstrate the "existence of a genuine dispute of material fact," or by "showing that the moving party's evidence is so sheer that it may not persuade the reasonable fact-finder to return a verdict in favor of the moving party." *Id.* at 1265.

If the dispositive issue is one on which the nonmoving party will bear the burden of proof at trial, the moving party may satisfy its burden by pointing out that the evidence in the record is insufficient with respect to an essential element of the nonmoving party's claim. *See Celotex*, 477 U.S. at 325. The burden then shifts to the nonmoving party, who must, by submitting or referring to evidence, set out specific facts showing that a genuine issue exists. *See id.* at 324. The nonmovant may not rest upon the pleadings, but must identify specific facts that establish a genuine issue for resolution. *See, e.g., id.*; *Little*, 37 F.3d at 1075 ("Rule 56 'mandates the entry of summary judgment, after adequate time for discovery and upon motion,

against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" (quoting *Celotex*, 477 U.S. at 322)).

## III. DISCUSSION

Plaintiff alleges claims under the Federal Employer's Liability Act ("FELA") and the Federal Safety Appliance Act ("FSAA"). "Under FELA, an injured railroad employee may recover damages for 'injury or death resulting in whole or in part from the negligence' of the railroad." *Huffman v. Union Pac. R.R.*, 675 F.3d 412, 416 (5th Cir. 2012) (citing 42 U.S.C. § 51). To prevail under FELA, an injured railroad employee must prove that "(1) the defendant is a common carrier by railroad engaged in interstate commerce; (2) [the plaintiff] was employed by the defendant with duties advancing such commerce; (3) his injuries were sustained while he was so employed; and (4) his injuries resulted from the defendant's negligence." *Weaver v. Mo. Pac. R.R. Co.*, 152 F.3d 427, 429 (5th Cir. 1998) (internal citations omitted).

A plaintiff need not meet the final requirement of showing negligence in cases in which he proves an equipment defect or malfunction in violation of the FSAA. *Crane v. Cedar Rapids & Iowa City R.R. Co.*, 395 U.S. 164, 166 (1969). Accordingly, the FSAA imposes "strict liability on railroads for

violations of the Act's safety standards." *Trinidad v. S. Pac. Transp. Co.*, 949 F.2d 187, 188 (5th Cir. 1991). FELA expressly bars any consideration of contributory negligence in cases where an employee's injury was caused by a safety violation. 45 U.S.C. § 53. The FSAA further prohibits the consideration of assumption of the risk in such cases. 49 U.S.C. § 20304.

The FSAA does not create a federal cause of action for violations of the Act. *Crane*, 395 U.S. at 166. Instead, employees who assert that they were injured because of an FSAA violation may sue under FELA. *Id.*; *see also Beissel v. Pittsburgh & Lake Erie R.R. Co.*, 801 F.2d 143, 145 (3d Cir. 1986) ("In short, the Safety Appliance Act[] provide[s] the basis for the claim, and the FELA provides the remedy."). "To recover for a violation of the [FSAA], a plaintiff must show: (1) the statute was violated; and (2) the violation was 'a causative factor contributing in whole or in part to the accident' that caused her injuries."[32] *McCormick v. New Orleans Pub. Belt R.R. Comm'n*, No. 16-1897, 2017 WL 2267204, at *5 (E.D. La. May 24, 2017) (quoting

32 Defendant has not moved for summary judgment on the issue of causation. The Court therefore limits its analysis to whether plaintiff has shown an issue of fact as to the first prong of his FSAA case, *i.e.*, whether the statute was violated. *See Celotex*, 477 U.S. at 323 ("[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] it believes demonstrate the absence of a genuine issue of material fact.").

*McGowan v. Wis. Cent. Ltd.*, No. 04-170, 2005 WL 2077355, at *3 (E.D. Wis. Aug. 26, 2005)). In determining whether a plaintiff has made such a showing, the Supreme Court has instructed that the Act should be "liberally construed as a safety measure." *United States v. Seaboard Air Line R.R. Co.*, 361 U.S. 78, 82-83 (1959).

The applicability of the FSAA's various safety provisions depends on whether the unit of equipment being regulated is a "vehicle," "locomotive," or a "train." 49 U.S.C. § 20301; *see also Solace v. CSX Transp., Inc.*, No. 11-1288, 2012 WL 1196668, at *1 (E.D. La. Apr. 10, 2012) (noting that there are "fundamental distinctions between 'vehicles,' 'locomotives' and 'trains' that give meaning to the various FSAA provisions"). Under the statute, a "vehicle"[33] is defined as a "car, locomotive, tender, or similar vehicle." 49 U.S.C. § 20301. The FSAA requires that a railroad equip its vehicles with properly working appliances, including, as relevant here, "efficient hand brakes" and "couplers coupling automatically by impact, and capable of being uncoupled, without the necessity of individuals going between the ends of the vehicles." 49 U.S.C. § 20302(a)(1). A railroad's "trains" must have "enough of the vehicles in the train . . . equipped with power or train brakes

33 The Court uses the terms "vehicle," "car," and "railcar" interchangeably.

so that the engineer . . . can control the train's speed." 49 U.S.C. § 20302(a)(5). Finally, the statute provides that a locomotive can be used "only if it is equipped with a power-driving wheel brake and appliances for operating the train-brake system." 49 U.S.C. § 20302(a)(4).

Here, the FSAA's regulations on "vehicles" govern plaintiff's claims, because they pertain to individual railcars, such as the ones that plaintiff was working on when he injured his back. *See Ditton v. BNSF R.R. Co.*, No. 12-6932, 2013 WL 2241766, at *10 (C.D. Cal. May 21, 2013) (applying the "vehicle" provision to a plaintiff who injured himself trying to disengage a hand brake on one car that was stationary); *McCormick*, 2017 WL 2267204, at *5 (applying the "vehicle" provision to a plaintiff's claim involving an alleged defect in a railcar's coupling equipment).

**A. The June 13, 2018 Incident**

Plaintiff first alleges that the NOPB violated the FSAA's requirement that railcars must have "efficient hand brakes," 49 U.S.C. § 20302(a)(1)(B), because the release rod on the hand brake did not work, and he was required to release the hand brake manually.[34] Defendant argues that the FSAA does

34 R. Doc. 14 at 4-7.

not apply to plaintiff's hand brake claim because there is "no evidence that the handbrake was defective or inefficient,"[35] and because at the time of the hand brake incident, the car was not "in use."[36] The Court addresses each contention in turn.

1. *Efficiency of the Hand Brakes*

The Court first addresses whether the hand brake on the vehicle at issue was inefficient within the meaning of the FSAA. The term "inefficient" is a "term of art to describe mechanisms that either do not function or do not function as intended by the manufacturer." *Strickland v. Norfolk S. R.R. Co.*, 692 F.3d 1151, 1156 n.9 (11th Cir. 2012); *see also Myers v. Reading Co.*, 331 U.S. 477, 483 (1947) ("Inefficient means not producing or not capable of producing the desired effect; incapable; incompetent; inadequate."). The Supreme Court in *Myers* held that there are two ways that an employee may show the inefficiency of a hand brake: (1) by presenting evidence of "some particular defect," or (2) by showing that the hand brake "failed to function[] when operated with due care, in the normal, natural, and usual manner." 331 U.S. at 483. "Proof of an actual break or physical defect . . . is not a prerequisite to finding that the [FSAA] has been violated." *Thompson v. Ala.*

35 R. Doc. 10-1 at 8-10.
36 *Id.* at 10-11.

*Great S. R.R. Co.*, No. 13-921, 2014 WL 970104, at *2 (E.D. La. Mar. 12, 2014).

Defendant contends that plaintiff, who was "the only witness with any personal knowledge," has provided the Court with no evidence that the hand brake at issue was inefficient.[37] Defendant specifically points to Cordes's testimony that it was "normal" for a release rod lever not to release the brake, and that it was not a "reportable defect."[38] But the FSAA and the case law interpreting it have established that proof of a physical defect is not required to show a violation of the statute. *See id.* (rejecting defendant's argument that plaintiff's FSAA claim is foreclosed without proof of a mechanical defect, and instead finding that a genuine dispute existed "regarding whether or not the independent brake functioned efficiently"); *Myers*, 331 U.S. at 484 (noting that, although plaintiff's testimony "was not descriptive of [the] precise mechanical defects in the structure of the brake," it provided "simple and direct testimony from which a jury reasonably might infer the brake's defectiveness and its inefficiency").

Plaintiff's testimony that he tried to "push [the release rod] to the right," which is "supposed to release the brakes," but that it did not work at

37 R. Doc. 10-1 at 8.

38 R. Doc. 10-3 at 13-14 (Richard Cordes Deposition, 28:22-29:11).

the time, thus requiring him to release the hand brake manually, creates an issue of fact as to whether the brake was ineffective at the time of plaintiff's injury.[39] *See Myers*, 331 U.S. at 483 (noting that plaintiff's testimony that he used the brake in the normal manner, but that it failed to work, is "substantial evidence of inefficiency as to make an issue for the jury"); *Strickland*, 692 F.3d at 1160 (holding that summary judgment evidence consisting of a railroad worker's uncorroborated testimony about the level of force he applied in turning the hand brake wheel was sufficient to create a genuine issue of fact (citing *Kennett-Murray Corp v. Bone*, 622 F.2d 887, 893-94 (5th Cir. 1970))). Although plaintiff testified that the release rod's ineffectiveness was "normal," he also testified that a "properly" functioning release rod would have released the brake,[40] and agreed that, although he "pulled [the release rod] like [he] *typically* do[es] to release a brake, it did not [release] it."[41] This testimony raises an issue of fact as to whether the hand brake failed to function when operated with due care and in the normal, natural, and usual manner. *See LeBeau v. Union Pac. R.R. Co.*, No. 18-439, 2020 WL 878287, at *4-5 (M.D. La. Feb. 21, 2020) (holding that there was a genuine issue of material fact on the efficiency question, even though

---

39 R. Doc. 14-2 at 10 (Richard Cordes Deposition, 72:12-16).

40 R. Doc. 10-3 at 9 (Richard Cordes Deposition, 24:17-22).

41 *Id.* at 13 (Richard Cordes Deposition, 28:2-4) (emphasis added).

plaintiff had testified "that tight brakes were not necessarily an abnormal occurrence in the yard"); *Rogers v. Norfolk S. R.R. Co.*, No. 13-798, 2015 WL 4191147, at *6 (N.D. Ohio July 10, 2015) (holding that the "failure of the hand brake to release when operated in the normal, natural, and usual manner remains a question for the trier of fact" where plaintiff testified that the hand brakes had "not release[d] before"); *Strickland*, 692 F.3d at 1155, 1162 (reversing the district court's dismissal of plaintiff's FSAA claims where plaintiff testified that he was unable to disengage a hand brake using the "quick release," which was not "an out-of-the-blue thing"). Accordingly, plaintiff's testimony that the release rod regularly fails to disengage the hand brake does not entitle the NOPB to summary judgment.

2. *Whether the Vehicle Was "In Use"*

Defendant next contends that plaintiff cannot prove that the railcar with the engaged hand brake was "in use" at the time of his injury, thereby precluding his recovery under the FSAA.[42] By the FSAA's terms, the statute applies to vehicles, locomotives, or trains that are "in use." *See* 49 U.S.C. § 20302; *Brady v. Terminal R.R. Ass'n of St. Louis*, 303 U.S. 10, 13 (1938) (stating that the Court must first address "whether the car can be said to have

42 R. Doc. 10-1 at 10-11.

been in use by the respondent at the time in question"). If the vehicle involved in Cordes's alleged injury was not "in use," then Cordes cannot show an FSAA violation, and the NOPB cannot be strictly liable for his injuries. *See Brady*, 303 U.S. at 13.

The NOPB argues that, because plaintiff testified that he was performing a predeparture inspection of an outbound train that "was at a standstill and had blue flag protection," it was not "in use" under the FSAA.[43] Defendant's argument is premised on the Fifth Circuit's decision in *Trinidad v. Southern Pacific Transportation Co.*, where the Fifth Circuit addressed a "question of first impression: whether the brake provisions of the Safety Appliance Act . . . apply to trains during predeparture inspection." 949 F.2d at 187-88. In *Trinidad*, the court held that Sections 1 and 9 of the FSAA, which "control air and power driving wheel brakes," did not apply to a train during a predeparture inspection because the train was not "in use" at the time of plaintiff's accident. *Id.* at 188-89. The brake provisions at issue in *Trinidad* concerned the statutory requirements relevant to trains in the predecessor to the FSAA. Those requirements are now reproduced in the current statute, and allow a railroad to use or permit the use of (1) a locomotive, "only if it is equipped with a power-driving wheel brake and

43 *Id.* at 10.

appliances for operating the train-brake system[]," and (2) a "train," "only if" it is equipped with certain "power or train brakes." 49 U.S.C. §§ 20302(a)(4)-(5).

The air-brake provisions at issue in *Trinidad* "specifically apply to *trains*, versus *vehicles*," and "courts in the Fifth Circuit since *Trinidad* have specified that its holding was limited to 'trains' rather than all rail vehicles." *See Barbay v. Union Pac. R.R. Co.*, No. 17-568, 2019 WL 639011, at *2-3 (M.D. La. Feb. 14, 2019) (holding that defendant was "not entitled to summary judgment based on the argument that the railcar was not "in use" at the time of the accident"); *Solice*, 2012 WL 1196668, at *2 (holding that "*Trinidad*['s] focus[] on whether a 'train' was 'in use' . . . is largely irrelevant to the issue [of] whether defective [hand] brakes were 'in use'"). Further, the *Trinidad* court itself limited the scope of its holding, stating that it addressed only "whether the *brake provisions* [of the FSAA] . . . apply to *trains* during predeparture inspection," and that its decision was based on "facts [of that case] alone." 949 F.2d at 187-89 (emphasis added).

Here, unlike in *Trinidad*, the alleged defect did not involve a "locomotive" or a "train," but instead concerns an individual vehicle's hand brake. And the provision on hand brakes that plaintiff alleges that the NOPB violated is applicable only to "vehicles." This is a notable distinction because

the "in use" inquiry is "fact intensive and thus differs depending on whether it is being applied to 'trains' or 'vehicles' withing the meaning of the statute." *Ditton*, 2013 WL 2241766, at *10; *see also Underhill v. CSX Transp., Inc.*, No. 05-196, 2006 WL 1128619, at *4 (N.D. Ind. Apr. 24, 2006) ("[U]nder the FSAA, there are separate 'in use' inquiries depending on whether the usage of a vehicle, locomotive, or train is at issue."). Indeed, the Supreme Court in *United States v. Erie Railroad Co.*, 237 U.S. 402 (1915), noted the distinction between provisions regulating "vehicles" and "trains," stating that:

> [T]he air-brake provision deals with running a train, while the other requirements relate to hauling or using a car. In one a train is the unit and in the other a car. As the context shows, a train in the sense intended consists of an engine and cars which have been assembled and coupled together for a run or trip along the road. When a train is thus made up and is proceeding on its journey it is within the operation of the air-brake provision. But it is otherwise with the various movements in railroad yards whereby cars are assembled and coupled into outgoing trains, and whereby incoming trains which have completed their run are broken up. These are not train movements, but mere switching operations, and so are not within the air-brake provision. The other provisions calling for automatic couplers and grab irons are of broader application and embrace switching operations as well as train movements, for both involve a hauling or *using* of cars.

*Id.* at 407-08 (emphasis added). The Court in *Erie* thus recognized that, although the safety requirements applicable to trains do not apply during switching operations because the *train* is not "in use," the requirements pertaining to *vehicles* are applicable during switching

operations because the individual railcars, unlike the full train, may be considered "in use" at the time. Further, the "broader application" of the vehicle hand brake provision makes sense given that an employee "cannot safely stop a [moving] train with a hand brake," but could likely stop a railcar during switching operations with a hand brake. *See Robb v. Burlington N. & Santa Fe. R.R. Co.*, 100 F. Supp. 2d 867, 870 (N.D. Ill. 2000) ("It is precisely because safety in the yard during switching operations calls for efficient hand brakes that can stop cars and other vehicles that Congress passed the hand brake provision."). Because this case involves a safety requirement applicable only to vehicles, cases like *Trinidad*, which address whether a train was "in use," are not dispositive here. Indeed, the Fifth Circuit has never applied *Trinidad*'s reasoning to cases involving the FSAA's provisions applicable to railcars.

Having found *Trinidad* inapplicable here, the Court is left to determine whether there remains an issue of fact as to whether the vehicle with the engaged hand brake was "in use" when plaintiff was injured. The Supreme Court has considered a railcar "in use" and thus applied the FSAA's strict liability requirements in cases with facts similar to this one. For example, in *Brady*, the plaintiff was injured while a train was "placed on a receiving track temporarily pending the continuance of transportation." 303 U.S. at 13. At

the time of the plaintiff's accident, the train was being inspected for defects. *Id.* The Court held that even though the vehicle was "motionless" at the time, it was still "in use" because the railcar "had not been withdrawn from use," nor "reached a place of repair." *Id.* Similarly, in *Swinson v. Chicago, St. Paul, Minneapolis & Omaha Railroad Co.*, 294 U.S. 529 (1935), the Court held that the railroad company was subject to strict liability under the Act when plaintiff was injured "while he was releasing a hand brake at the end of a tank car." *Id.* at 530-32.

Here, as in *Swinson*, Cordes asserts that he was injured while trying to disengage a hand brake on a railcar. At the time of Cordes injury, the railcar was stationary on the NOPB's main line. Cordes had noticed that the vehicle's hand brake was engaged when the train pulled into the station moments earlier. Thus, as in *Brady*, although the vehicle was motionless at the time of the accident, it had not been withdrawn from use, but rather was undergoing an inspection before it left the station again. Accordingly, the Court finds that there remains a dispute of material fact as to whether the vehicle that Cordes was working on was "in use" at the time of his injury for the purposes of the FSAA.

For these reasons, defendant is not entitled to summary judgment as to plaintiff's 2018 hand brake incident.

**B. The July 31, 2020 Incident**

Plaintiff next alleges that the NOPB violated the FSAA's requirement that railroad cars be "equipped with . . . couplers coupling automatically by impact," 49 U.S.C. § 20302(a)(1)(A), because a knuckle fell out of a car and thus prevented the coupler from functioning properly.[44] Defendant again asserts that the FSAA does not apply to plaintiff's knuckle claim because the knuckle/coupler was not inefficient, and because the railcar was not "in use" at the time of the injury.[45]

The FSAA provision in dispute here involves "couplers." The Supreme Court has explained how "couplers" function on a railcar as follows:

> Railroad cars in a train are connected by couplers located at both ends of each car. A coupler consists of a knuckle joined to the end of a drawbar, which itself is fastened to a housing mechanism on the car. A knuckle is a clamp that interlocks with its mate, just as two cupped hands—placed palms together with the fingertips pointing in opposite directions interlock when the fingers are curled. When cars come together, the open knuckle on one car engages a closed knuckle on the other car, automatically coupling the cars. The drawbar extends the knuckle out from the end of the car and is designed to pivot in its housing, allowing the knuckled end some lateral play to prevent moving cars from derailing on a curved track.

44 R. Doc. 14 at 11-12.
45 R. Doc. 10-1 at 11-13.

*Norfolk & W. R.R. Co. v. Hiles*, 516 U.S. 400, 401-02 (1996) (internal citations omitted).

1. *Efficiency of the Knuckles/Couplers*

The FSAA requires railroads to have automatic couplers, and imposes "absolute liability upon a railroad for injuries sustained when the automatic couplers fail to perform on the occasion in question." *Maldonado v. Mo. Pac. R.R. Co.*, 798 F.2d 764, 767 (5th Cir. 1986), *abrogated on other grounds by Warger v. Shauers*, 574 U.S. 40 (2014). In *Norfolk*, the Supreme Court extended the FSAA's duty, holding that the Act "creates an absolute duty requiring not only that automatic couplers be present, but also that they actually perform." 516 U.S. at 408-409; *see also S. Pac. Co. v. Mahl*, 406 F.2d 1201, 1203-04 (5th Cir. 1969) ("It is not only the duty of the railroad to provide such couplers, but to keep them in such operative conditions that they will always perform their functions." (citing *Chi., St. Paul, Minn. & Ohio R.R. Co. v. Muldowney*, 130 F.2d 971, 975 (8th Cir. 1942))).

A plaintiff can establish a railroad's liability for an accident involving a coupling mechanism either by: (1) providing evidence that the two cars failed to couple automatically on impact, or (2) showing a defect in the coupling equipment. *DeBiasio v. Ill. Cent. R.R.*, 52 F.3d 678, 683 (7th Cir. 1995). A "'plaintiff need not identify a specific defect[,]' but must only identify a

specific piece of equipment covered by the FSAA which he alleges is defective." *McCormick*, 2017 WL 2267204, at *5 (quoting *Debiasio*, 52 F.3d at 683)). Here, plaintiff testified that he injured his back a second time when he was required to pick up a knuckle that had fallen on the ground because the knuckle pin that holds the knuckle to the coupler was "broken or . . . missing."[46]

Defendant, relying on plaintiff's testimony that a broken knuckle pin was a common occurrence, and not indicative of a defective coupler,[47] asserts that there is no genuine issue of material fact as to whether the knuckle or coupler was defective.[48] But as noted above, plaintiff is not required to show that there was a defect in the knuckle or coupler, and instead can show a violation of the FSAA's coupling requirement by providing evidence that two cars failed to couple automatically. *See Mayo v. Pub. Belt R.R. Comm'n, City of New Orleans*, No. 09-5850, 2010 WL 2361422, at *3 (E.D. La. June 8, 2010) (rejecting defendant's argument that it was entitled to summary judgment because "plaintiff ha[d] presented no evidence that the coupler on the subject car was defective, noting that "the unexplained uncoupling of the subject cars would suggest that the coupler was defective"). Plaintiff's

46 R. Doc. 10-3 at 23 (Deposition of Richard Cordes at 46:2-25).
47 *Id.*
48 R. Doc. 10-1 at 12.

testimony that, because the knuckle's pin was "missing or broken," the switchmen were unable "to couple that car to another car," is sufficient to raise a genuine issue of fact as to whether defendant's coupler violated 49 U.S.C. § 20302(a)(1)(A).[49] *See McCormick*, 2017 WL 2267204, at *5 (finding that plaintiff's testimony that the "knuckle pin" was "not working properly" after plaintiff was unable to uncouple the railcars presented "at least a genuine issue of fact as to whether the coupler or cut lever was defective, which, if proven, is a violation of 49 U.S.C. § 20302(a)(1)(A)"); *Romero v. CSX Transp., Inc.*, No. 06-1783, 2008 WL 5156677, at *7 (D.N.J. Dec. 8, 2008) (holding that plaintiff had established a prima facie claim for liability against defendant where plaintiff "by affidavit and in deposition ha[d] asserted that the cars did not couple automatically upon impact").

Further, plaintiff's testimony that replacing broken knuckle pins was a common part of the job for a carman, does not mean that there can be no FSAA violation. The FSAA imposes "*absolute* liability upon a railroad for injuries sustained when the automatic couplers fail to perform," regardless of whether those couplers regularly fail to perform. *See Maldonado*, 798

49 R. Doc. 10-2 at 21-22 (Deposition of Richard Cordes at 44:24-45:2); *see also* R. Doc. 10-3 at 19 (Deposition of Richard Cordes at 42:18-25) ("This is a knuckle right here[]. It was out of the car. The car cannot couple together.").

F.2d at 767 (emphasis added). A railroad cannot avoid liability under the FSAA by regularly exposing its workers to couplers that do not properly function. Because a genuine issue of material fact exists as to whether defendant's coupler was inefficient or defective in violation of the FSAA, defendant is not entitled to summary judgment on this claim.

2. *Whether the Vehicle Was "In Use"*

It is undisputed that, at the time of plaintiff's accident, the railcar at issue was involved in "switching operations."[50] "Switching operations are procedures by which rail cars and engines are separated, moved and reassembled into trains." *Romero*, 2008 WL 5156677, at *1. The parties dispute whether the railcar at issue was "in use" during the switching operations when plaintiff placed the knuckle back into the coupler. Defendant argues that it is entitled to summary judgment because the vehicle was not "in use," and instead was engaged in "switching operations" which involved "*no movement* anywhere near Cordes."[51]

To support this assertion, defendant notes that "some" other courts "have held that the [F]SAA does not generally apply to railcars involved in

50 R. Doc. 10-2 at 3; *see also* R. Doc. 10-3 at 21 (Deposition of Richard Cordes at 44:13-20).

51 R. Doc. 10-1 at 13-14.

'switching operations.'"[52] Defendant relies on a non-binding Fourth Circuit case, *Phillips v. CSX Transportation, Inc.*, which stated that the "FSAA does not apply to train cars involved in switching operations." 190 F.3d 285, 289 (4th Cir. 1999) (per curiam).[53] In making this statement, *Phillips* relied on cases, such as *Trinidad* and *Seaboard*, both of which analyzed whether the FSAA's air brake provisions that apply to *trains* "in use" were applicable during switching operations. *Id.* at 289. Since *Phillips*, multiple courts have noted that *Phillips*'s statement that railcars are not "in use" during switching operations is incorrect because it fails to "distinguish the inquiry of whether a train is in use from that of whether a rail vehicle is in use." *Underhill*, 2006 WL 1128619, at *5 ("Convincing arguments have been made by other courts that this statement is not correct . . . ."); *Solace*, 2012 WL 1196668, at *2 & n.2 ("[T]he confusion that apparently accompanies this issue [of whether the FSAA applies to train cars during switching operations] may derive from a statement in *Phillips*."); *Coria v. Union Pac. R.R. Co.*, No. 04-354, 2008 WL 11383300, at *2 (D. Utah May 6, 2008) ( "[A]lmost every court to address the question after *Phillips* ha[s] disagreed with *Phillips*.").

---

52 *Id.* at 13.

53 The second case relied on by defendant, *Port Terminal R.R. Ass'n v. Jones*, 82 S.W.3d 126 (Tex. App 2002), relies on *Phillips* to come to the same result.

The Court does not find defendant's non-binding precedent persuasive here, particularly in light of the *Phillips* court's failure to differentiate between the safety provisions applicable to trains and vehicles. This lack of differentiation is especially concerning in the context of switching operations because

> [a] failure to differentiate between safety provisions . . . would render the automatic coupling requirement virtually meaningless, because coupling, by definition, involves the joining of rail cars to form a train, which is the very purpose of switching operations. The FSAA clearly requires that a 'vehicle' must automatically couple upon impact, and to interpret the requirement as applying only when switching operations have concluded and a train has been assembled contravenes logic and common sense.

*Romero*, 2008 WL 5156677, at *5-6. Moreover, the Supreme Court in *O'Donnell v. Elgin, J. & E. Railroad Co.*, 338 U.S. 384 (1949), suggested that the FSAA's coupling requirement for railcars applies even when the cars are involved in switching operations. *Id.* at 394 ("As to the claim based on the Safety Appliance Act, we hold that the plaintiff was entitled to a preemptory instruction that to equip a car with a coupler which broke in the switching operation was a violation of the Act . . . ."). Accordingly, the Court finds a material dispute of fact as to whether the railroad car involved in Cordes's alleged injury was "in use," which precludes summary judgment.

For these reasons, defendant is not entitled to summary judgment as to plaintiff's claim arising out of the 2020 knuckle pin incident.

## IV. CONCLUSION

For the foregoing reasons, NOPB's motion for summary judgment[54] is DENIED.

New Orleans, Louisiana, this 23rd day of February, 2022.

Sarah Vance

SARAH S. VANCE
UNITED STATES DISTRICT JUDGE

54 R. Doc. 10.